John T. OLAH, Libelant,

v.

S.S. JALADURGA, her engines, boilers, etc., and Scindia Steam Navigation Co., Ltd., in rem, Respondents.

SCINDIA STEAM NAVIGATION CO., Ltd., Impleading Petitioner,

v.

MOON ENGINEERING COMPANY, Incorporated, Impleaded Respondent.

No. 8330.

United States District Court E. D. Virginia, Norfolk Division.

June 10, 1964.

———◆———

Parsons, Stant & Parsons, L. S. Parsons, Jr., Norfolk, Va., for libelant Olah.

Vandeventer, Black, Meredith & Martin, Walter B. Martin, Jr., Norfolk, Va., for JALADURGA, etc.

Rixey & Rixey, William B. Eley, Norfolk, Va., for Moon Engineering Co., Inc.

WALTER E. HOFFMAN, Chief Judge.

Libelant, a first class machinist employed by Moon Engineering Company, was injured on January 9, 1963, while doing repair work at or near the No. 4 hold of the SS JALADURGA. Several of the vessel's deep tank tops had been removed from the various holds and had been placed on deck. Some tops required straightening, while others went through the process of having nuts removed from the cover because they had become frozen. The particular deep tank top cover which required libelant's attention immediately prior to the accident had been placed in a position on the starboard main deck in the immediate area of the No. 4 hatch coaming—a distance estimated at one and one-half to five feet from the inboard edge of the manhole or tank top cover to the edge of the hatch coaming.[1] Just before the accident the No. 4 hatch was covered to keep sparks from a welder's torch from falling into the cargo hold.[2] The McGregor-type hatch cover operates on rollers which move along a track on top of the coaming. The hatch cover is moved by the assistance of winches operated from the masthouse with wires run-

---

1. A distance of two feet is accepted as reasonable.

2. The torch had been used above the hatch opening. The chances of sparks falling into the cargo hold when the torch was used in heating studs on the tank top covers were rather remote.

ning to small eyes at the forward end of each hatch cover section. Other than at the after end of the hatch coaming where the hatch sections are finally dropped, there is no apparent danger in removing the hatch cover unless some portion of a person's body is on the trackway where the rollers operate.

Libelant's father, John A. Olah (referred to as Olah, Sr.) was Moon's leading man on the job. With him were Moon employees Hoyt, Faries and the libelant. When the workmen were nearly finished removing the balance of the studs on one deep tank cover, the libelant, who had just broken a nut loose on the cover, was handing or about to hand a wrench to his co-worker Faries; libelant turned slightly to his left and started to straighten up from his squatting position; to assist himself he rested his left forearm and left hand on the top of the coaming track; at the same moment the hatch was in the initial process of being opened, with the result that the rollers passed over his fingers. The injury caused the amputation of the left middle and ring fingers at the proximal third phalanx, together with the loss of the nail of the little finger.

During the morning hours the hatch was open. Following lunch the hatch was closed at the request of Moon to prevent sparks from flying into the general cargo stowed below. Four deep tank covers had been removed from the hold and placed upon the deck—two covers being on each side of the hatch coaming in the deck area. Libelant and his co-workers had already straightened one cover situated on the starboard side of the deck, and were working on the other one when the accident occurred.

It is customary to put the tank top covers back in the hold to ascertain whether they fit properly following any straightening process. There is a conflict in the evidence as to whether Olah, Sr. had been told that the hatch cover would be removed on the afternoon in question. Olah, Sr. denies any such information. As the vessel was manned by a crew from India there was, understandably, a language barrier, but Cadet Officer Katre acted as liaison between the vessel and Olah, Sr. as Katre was able to speak enough English to be understood. In any event there is evidence that Olah, Sr. was told that the hatch would be opened in order that the already straightened cover could be lowered into the hold and tested prior to the shipyard workers leaving for the day. In the opinion of the court it is unnecessary to resolve this conflict.

Libelant argues that, prior to giving the order to open the hatch, the vessel's bosun shouted "cabadar" which means to be careful and take your positions.[3] The purpose of this warning was to remove all persons from the after end of the hatch coaming where the sections of the hatch covering would be dropped when the hatch was opened. Libelant insists that the warning should have been given to any person in the area and that it was foreseeable that a workman, squatting a distance of two feet from the hatch coaming, would suddenly rise and innocently place his hand upon the trackway on top of the coaming. We do not agree that this was a foreseeable circumstance requiring a warning. It is conceded by all that the libelant was not in a place of danger where he was then working. Olah, Sr. had seen his son working in a crouched position just three seconds prior to the accident. No witness apparently heard any sound of the hatch opening prior to libelant's injury and, indeed, it appears to have been opened simultaneously with libelant's action in attempting to straighten up and placing his hand on the trackway.

We think that the case is essentially governed by Union Carbide & Carbon Corp. v. Peters, 4 Cir., 206 F.2d 366, where the defendant permitted volatile

3. Cadet Katre further testified that he told Olah, Sr. that the hatch would be opened about ten minutes before the accident.

We need not comment upon this testimony in view of the conclusions reached.

gases to escape from its line and accumulate within its gate box. The defendant knew that children occasionally played in the area of the gate box, which was not locked and could be opened and entered. Plaintiff's companion dropped a cigarette lighter through the grill of the gate box and plaintiff went inside to recover it. While inside, plaintiff tried the lighter to see whether it would still work, whereupon there was a flash explosion and plaintiff was injured. The trial court held that the gate valve installation was a dangerous instrumentality and it was the duty of the defendant to exercise reasonable care to avoid injuring persons who might play around or upon the gate box and that, while it was not required that the defendant should be able to foresee the exact circumstances attending the accident in question, it was reasonable to conclude that one playing in the area would drop some object through the grill which would be sufficient to cause a child or some person to enter the gate box to recover same. On appeal the United States Court of Appeals for the Fourth Circuit in an opinion by Judge Dobie stated that not every act of carelessness or inadvertence may be characterized as actionable negligence, and that one whose conduct falls below the standard prescribed by law—thereby creating a risk of injury to others—is responsible only if danger to others might reasonably be foreseen from such conduct. Relying upon the celebrated case of Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253, the court quotes Chief Justice Cardozo as follows:

> "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. * * * The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury."

In reversing the trial court, the Fourth Circuit held that the defendant was not required to foresee that anyone other than its own inspectors would enter the gate box for any purpose, or that, while there, would cause a spark to be ignited in close proximity to escaping gas.

A simple illustration will perhaps more aptly suggest the factual situation. If a workman is in the process of cleaning an office floor near an open window while on his hands and knees and the occupant of the office concludes to close the window, can it be said to be negligence if, contemporaneous with the window closing, the workman reaches up and places his fingers under the window as it is in the process of being closed?

Assuredly the sudden change of position from one of complete safety, the stopping of work, the attempt to straighten up, and the thrusting of a hand beneath the rollers of a hatch then in the first stages of being opened, present a combination of circumstances that no reasonable person could reasonably foresee. There was no defect in the hatch or its operative movements. If a duty to warn was owing to the libelant, it would be equally owing to a person standing fifteen feet away from the coaming who might, for some unknown reason, rush to the coaming and place his hand on the trackway.

We acknowledge that the shipowner has a non-delegable duty to provide a business invitee a *reasonably* safe place in which to work. We agree that the libelant *did not assume the risk* of any injury resulting from the negligence of the ship's officers or crew members. Socony Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 573, 80 L.Ed. 989. We merely hold that, under the circumstances here presented, there was no duty to warn the libelant who was then in a conceded place *of safety where he was working*, and that the chain of events leading up to the unfortunate accident did not present a foreseeable situation. The authorities relied upon by libelant are inapposite. They all present *a factual situation where the* injury was brought about by negligence

164

and the claimants were in proper places, doing what they were supposed to be doing, with knowledge of the defendants. In each instance what occurred was reasonably foreseeable. Once again, unless we are to hold the shipowner responsible for any and all accidents aboard the vessel, we must conclude that libelant's injuries were the result of an industrial accident and not from negligence or unseaworthiness.

A decree will be prepared and presented, after opportunity for inspection, dismissing the libel with costs. Manifestly this is not a case where the impleading petitioner is permitted to recover attorney's fees and expenses. The impleading petition will be dismissed with costs assessed in favor of Moon Engineering Company.